**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASHLEY MCLAUD, | |
| Plaintiff, | CIVIL ACTION NO. 3:14-CV-00737 |
| v. | (JUDGE CAPUTO) |
| INDUSTRIAL RESOURCES, INC., et al., | |
| Defendants. | |

## MEMORANDUM

Presently before the Court are two Motions for Summary Judgment filed by Defendant IR Ventures, Inc., d/b/a Industrial Resources ("IR") (Doc. 62) and Defendants CHEP (U.S.A.) Inc., CHEP International, Inc., and CHEP Container and Pooling Solutions, Inc. (collectively, "CHEP") (Doc. 65), and a Motion to Dismiss filed by Defendant Gerald Dykstra (Doc. 45). In her Amended Complaint (Doc. 5), Plaintiff Ashley McLaud asserts claims for strict products liability, negligence, and breach of the implied warranty of merchantability against all named Defendants arising out of a workplace accident involving a chain driven live roller conveyor machine. For the reasons that follow, Defendants' Motions will be granted. Judgment will be entered in favor of Defendants on all claims.

### I. Relevant Factual Background

The facts presented in the summary judgment record are as follows:

**A. The Injury**

Plaintiff Ashley McLaud injured her right hand and forearm while employed as a production worker for Millwood, Inc. ("Millwood") on April 17, 2012. (IR's Statement of Material Facts ("IR SMF") ¶ 1, Doc. 64.[1]) The injury occurred at Millwood's facility located in

---

[1] Local Rule 56.1 requires the nonmoving party's statement of facts to respond to the numbered paragraphs set forth in the moving party's statement. L.R. 56.1 The responsive statement "shall include references to the parts of the record that support the statements." *Id.* Plaintiff's statement of facts contains assertions,

Meshoppen, Pennsylvania. (*Id.*) The facility repaired wooden pallets for CHEP International, Inc., pursuant to the terms of the Service Operating Agreement between CHEP and Millwood. (*See* Service Center Operating Agreement p. 4, Ex. 16, Doc. 64-1.) At the time Plaintiff sustained her injuries, she was working on an assembly line known as the "short line." (*See* IR SMF ¶ 3.) The short line was configured in a horseshoe shape, with the right-hand portion consisting of one of two chain driven line roller conveyor machines ("CDLR-1"). (*See id.* ¶ 4; Short Line Assembly Diagram ("Diagram"), Ex. 3, Doc. 64-1.) Three repair technicians situated outside of the short line made necessary repairs to the wooden pallets and then would place the repaired pallets onto the CDLR-1. (IR SMF ¶ 8.) The CDLR-1 moved repaired pallets to the next station of the assembly line, referred to as the stop machine, at which the pallets were stopped and arranged for the next phase of the line. (IR SMF ¶ 5.) From the stop machine, another CDLR conveyor machine ("CDLR-2") moved the pallets to the next station, referred to as a pallet stacking machine, which received the repaired pallets from the CDLR-2 and stacked them in configurations of thirteen pallets high. (IR SMF ¶¶ 6-7.) A worker would then paint all four sides of the pallets before the they were pushed down a gravity-driven conveyor line, where they would be processed for shipping back to CHEP. (IR SMF ¶ 7.)

Plaintiff's injury occurred while she was working the night shift on April 17, 2012. (IR SMF ¶ 11.) At the time of her injury, Plaintiff was working in the quality line lead position, which normally required her to be located inside the short line so that she could inspect the pallets after the repair technicians made the necessary repairs. (*Id.* ¶ 9; Diagram (location marked with a circled "X").) After taking a lunch break, Plaintiff resumed work around 3:00

---

denials, and conclusions that are unsupported by citations to the record. (*See* Docs. 72, 75.) Therefore, the court will adopt Defendants' statement of facts, except for those facts clearly disputed by Plaintiff with adequate record references. *See* L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."). *See generally United States ex rel. Paranich v. Sorgnard*, 286 F. Supp. 2d 445, 448 n.3 (M.D. Pa. 2003)

a.m. and was soon thereafter beckoned over by a co-worker, Nick Cona. (IR SMF ¶¶ 11-12, 14 .) Mr. Cona had discovered a glue-based rat trap stuck to one of his pallets and wanted to pull a prank on another co-worker, Elaina Danko. (*Id.* ¶12.) Mr. Cona's prank sought to place the trap inside Ms. Danko's work station so that, when she stepped backwards, Ms. Danko would step on the trap and it would stick to her foot. (*Id.* ¶13.) Mr. Cona asked Plaintiff to join in on the prank by placing the rat trap in Ms. Danko's work station. (*Id.* ¶¶ 14-15.) Plaintiff agreed to participate in the prank. (*Id.* ¶ 15.)

In order to deliver the trap to Plaintiff, Mr. Cona attempted to throw it over the CDLR-1; however, the toss came up short, and the trap fell onto the CDLR-1. (*Id.* ¶ 17.) The trap became stuck to one of the moving rollers in the machine. (*Id.* ¶ 18.) After seeing that the trap was stuck in the rollers, Mr. Cona told Plaintiff to "hold on" until he came over to help. (Cona Dep. 41:4-5, Ex. 2, Doc. 64-1.) But when Mr. Cona turned away from Plaintiff to put his work materials down, he heard Plaintiff scream. (*Id.* at 41:5-6.) When Mr. Cona turned back around, he saw Plaintiff's arm caught in the rollers. (*Id.* at 42:13-14.) Plaintiff had "instinctively" attempted to grab the trap off of the active CDLR-1, but her glove became stuck to the glue paper attached to the operating roller, which in turn pulled Plaintiff's arm into the rollers and resulted in injuries. (IR SMF ¶¶ 21-22.) In an attempt to shut down the machine, Mr. Cona immediately pulled the emergency stop ("estop") cable that was located on his side of the CDLR-1, but the estop did not shut down the equipment, and the CDLR-1 remained operating with Plaintiff's arm stuck in the roller. (IR SMF ¶ 25.) There was no button within the reach of Plaintiff that could have shut down the machine. (*See* de Richemond Report 10, Ex. 15, Doc. 64-1.) Mr. Cona then ran to the main control box located near the CDLR-2 and turned off the power to the entire assembly line. (IR SMF ¶ 28.) Plaintiff estimated that approximately five seconds passed between when her glove first got stuck on the CDLR-1 roller and when Mr. Cona shut off the power. (*Id.* ¶ 29.)

Plaintiff admitted in her deposition testimony that she had seen warning labels on the CDLR-1 that included both written warnings and image-based warnings, and understood those labels to mean that you should "not stick your hands in the machine." (*Id.* ¶ 37; *see id.*

3

¶¶ 39, 41; *see, e.g.*, Warning Label, Ex. 5, Doc. 64-1.) Mr. Cona and Mr. Raymond Hunter, another pallet repair technician, both testified that warning stickers were located around the short line that warned about severe injuries being caused by the machinery, including picture warnings. (*Id.* ¶¶44-45.) New hires at the Millwood plant received warnings to not touch the rollers. (*Id.* ¶ 46.) Prior to her injury, Plaintiff had reviewed and initialed a page of lockout/tag out procedures and also completed a test regarding such procedures. (*Id.* ¶ 50.) Brad Arnold, Executive Vice President of Operations for Millwood, testified that Millwood, and not CHEP, controlled all CDLR operations on April 17, 2012, and all other times relevant to Plaintiff's injury. (CHEP's Statement of Material Facts ("CHEP SMF") ¶ 49, Doc. 66.)[2] But Plaintiff and Defendant CHEP dispute whether Millwood or CHEP owned the CDLR-1 at the time the injury occurred. (*See* CHEP SMF ¶ 63; IR SMF ¶ 67; Pl.'s Counterstatement of Material Facts ("PCMF") to CHEP ¶ 63; PCMF to IR ¶ 67.)

**B. Industrial Resources of Michigan and IR Ventures, Inc.**

Named Defendant Industrial Resources of Michigan ("IROM") was a corporation that manufactured material handling equipment that dissolved in April 2007 due to financial difficulties. (IR SMF ¶¶ 57, 64.) IROM manufactured some of the components in the short line on which Plaintiff was working on the night the injury occurred. (*Id.* ¶ 53.) However, the CDLR-1 component of the short line–the machine that caused Plaintiff's injury–was not manufactured by IROM. (*Id.* ¶ 54.) The CDLR-1 was manufactured by Omni Metal Craft Corporation ("Omni"), which in turn sold that machine to IROM, which in turn sold it to Endless Warehouse in 1997, which then sold the machine to Millwood in late 2007. (*Id.* ¶¶ 55, 67.) Omni is still a viable entity today. (*Id.* ¶ 55.) IROM did not make any revisions or modifications

---

[2] Plaintiff cited to no record evidence controverting Mr. Arnold's testimony with respect to Millwood's control over all CDLR operations. (Pl.'s Counterstatement of Material Facts ("PCMF") to CHEP ¶ 49.) It is thus deemed admitted. *See Sorgnard*, 286 F. Supp. 2d at 448 n.3; Fed. R. Civ. P. 56(e)(2); L.R. 56.1. This is particularly appropriate given that, in the very next paragraph of CHEP's statement of facts, Plaintiff attempts to cite to record evidence to controvert Mr. Arnold's testimony. (*See* PCMF to CHEP ¶ 50.)

to the CDLR-1 after purchasing it from Omni. (*Id.* ¶ 56.) Although Plaintiff and CHEP dispute whether Millwood or CHEP owned the CDLR-1 at the time Plaintiff's injury occurred, it is undisputed that at some point CHEP purchased the short line assembly, including the CDLR-1, from Millwood. (*See* CHEP SMF ¶ 63; IR SMF ¶ 67; PCMF to CHEP ¶ 63; PCMF to IR ¶ 67.)

IR Ventures, Inc. ("IR") was formed around May 7, 2007 when a group of investors bought some of the assets of IROM via a Bill of Sale. (*Id.* ¶ 59; *see* Bill of Sale, Ex. 12, Doc. 64-1.) Whereas IROM was owned by Bernie Kamps, Chuck Meier, and Defendant Gerry Dykstra, IR is owned by a different group of investors. (IR SMF ¶ 60.) Page One of the Bill of Sale states:

> Purchaser [IR] is not assuming any debt, liability, charge, expense, financial obligation or other claim of any nature of Seller [IROM] . . . arising from facts, events or circumstances occurring on or before the date of this Bill of Sale with regard to any of the Acquired Assets, or any other liabilities or obligations of Seller whatsoever . . . .

(Bill of Sale 1.) IR is located at an address that is different from where IROM was located (IR SMF ¶ 62), changed most of its staff and employees (*id.* ¶ 63), continues to manufacture material handling equipment (*id.* ¶ 64), has developed new products for sale (*id.*), and has a customer base that is materially different from the customer base of IROM (*id.* ¶ 65.) IR continues to use IROM's slogan and utilizes some of the same manufacturing work force. (Yoder Dep. 35:5-6, 36:15-25, Ex. A., Doc. 76-1.)

**C. The Refit of the CDLR-1**

At some point after Millwood purchased the CDLR-1, but before Plaintiff's injury, the machine underwent a refit. (*See* Shingler Dep. 100:4-16, Ex. 7, Doc. 64-1.) During this refit, the estop cables were added to the CDLR-1. (*Id.* 99:8-100:3.) David Shingler, the Plant Manager at Millwood, testified that Millwood's employees physically implemented the refit, and that Millwood was the company responsible for modifying the machine. (*See id.* at 100:13-16; *see also* Pl.'s Br. in Opp'n to CHEP 6, Doc. 70.) When asked if he "kn[e]w whether CHEP was involved in the decision-making process to modify the machine," Shingler testified:

"I don't know." (*See* CHEP Br. in Reply 8, Doc. 78 (quoting unprovided portion of Shingler Deposition); Pl.'s Br. in Opp'n to CHEP 7 (quoting same portion).) Plaintiff contends this statement of uncertainty raises an inference that CHEP might have played a role in the decision to refit the CDLR-1. (*See* Pl.'s Br. in Opp'n to CHEP 7-8.) The report prepared by Plaintiff's expert, Albert L. de Richemond, P.E., opines that had an estop cable been installed in a location within the reach of Plaintiff when she became entrapped in the CDLR-1, her injuries could have been prevented or minimized. (di Richemond Report 10.) The report also opines that the existing estop cable did not function as it was supposed to. (*Id.*)

## II. Legal Standard

**A.   Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the

moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

In order to prevail on a motion for summary judgment, the non-moving party must show "specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). Although the non-moving party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III. Discussion

Defendant IR bases its Motion for Summary Judgment on multiple grounds, including

the rule that a successor does not assume the liabilities of its predecessor by virtue of an asset purchase agreement. Plaintiff argues that the product line exception to the general rule of successor non-liability applies, and therefore IR can be held strictly liable for any harms arising from defects in the CDLR-1 sold by IROM. Because the Court concludes that the product line exception does not apply to IR, Plaintiff cannot hold IR liable on a theory of successor liability. Defendant IR's Motion for Summary Judgment will therefore be granted on Counts I, II, and III. Defendant CHEP contends that summary judgment is warranted with respect to Plaintiff's strict products liability and breach of warranty claims because CHEP did not manufacture, distribute, or sell the CDLR-1. Additionally, CHEP argues that Plaintiff's negligence theories fail because they lack evidentiary support or fail as a matter of law. The Court agrees with the arguments advanced by CHEP and will grant summary judgment in its favor on Counts IV, V, and VI. Finally, because Plaintiff concedes that she has no claim against Defendant Dykstra, all claims against Dykstra in Counts I, II, and III will be dismissed.

**A. IR's Motion for Summary Judgment Will Be Granted Because the Product Line Exception to the Rule of Successor Non-Liability Does Not Apply**

Plaintiff argues that there are genuine issues of fact with respect to its claims against IR regarding whether the CDLR-1 was defective at the time the now-dissolved IROM sold the machine to Endless Warehouse in 1997, and if so, whether IR can be held liable for harms arising from such a defective. (*See* Pl.'s Br. in Opp'n to IR 2, Doc. 76.) IR contends that, even if there was a defect with the CDLR-1, IR cannot be held strictly liable because it is a distinct entity that is shielded by Pennsylvania's successor non-liability rule. (*See* IR's Br. in Supp. 21-23; IR's Br. in Reply 2-10, Doc. 77.) Because no exception to the general rule of successor non-liability applies to this case, the Court concludes that IR cannot be held directly liable for harms stemming from a purported defect with the CDLR-1. IR's Motion for Summary Judgment will therefore be granted.

"It is a 'well-settled rule of corporate law [that] where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor.'" *Conway v. White Trucks, Div. of White Motor*

*Corp.*, 885 F.2d 90, 93 (3d Cir. 1989) (quoting *Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir. 1986)); *see Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005) ("With respect to successor liability in this Commonwealth, it is well-established that when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property.") (quotations omitted). However, there are exceptions to this general rule, only one of which is relevant to the instant case: the product line exception. Under the product line exception, courts may hold a successor company strictly liable for injuries caused by defects in units of the same product line "where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation." *Keselyak v. Reach All, Inc.*, 660 A.2d 1350, 1353 (Pa. Super. Ct. 1995) (quoting *Ramirez v. Amsted Indus., Inc.*, 431 A.2d 811, 815 (N.J. 1981)) (the "*Ramirez* test"). In order to assess whether this test is met, Pennsylvania courts look to the *Ray* factors, recognized by the superior court in *Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 109 (Pa. Super. Ct. 1981) (citing *Ray v. Alad Corp.*, 560 P.2d 3 (Cal. 1977)), to determine whether the product line exception applies. The *Ray* factors direct courts to consider:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Dawejko*, 434 A.2d at 109 (citing *Ray*, 560 P.2d at 9). Although some courts applying Pennsylvania law have interpreted the first *Ray* factor to be a prerequisite to invocation of the product line exception, *see, e.g.*, *Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 332 (3d Cir. 2002) ("[T]he inability to recover from an original manufacturer is a prerequisite in Pennsylvania to the use of the product line exception."); *Keselyak*, 660 A.2d at 1354, the Pennsylvania Supreme Court has clarified that none of the *Ray* factors is mandatory. *See*

*Schmidt v. Boardman Co.*, 11 A.3d 924, 945 (Pa. 2011). Rather, in accordance with the original standard explicated in *Dawejko*, the *Ray* factors, as well as the *Ramirez* test noted above, are to be used as a guide in determining whether the product line exception applies. *See Schmidt*, 11 A.3d at 945; *see also Dawejko*, 434 A.2d at 111. No one factor is dispositive. *See Dawejko*, 434 A.2d at 111 (concluding that, "[g]iven its philosophical origin, [the product line exception] should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation").

Without considering the presence or absence of any of the *Ray* or *Ramirez* factors mandatory, the Court concludes that the undisputed facts in the record establish that the product line exception to the general rule of successor non-liability does not apply.[3]

With respect to the first *Ray* factor, it is undisputed that the manufacturer of the CDLR-1 is Omni, a still viable company which Plaintiff did not elect to sue. (IR SMF ¶ 55.) Although a plaintiff's inability to recover from the original manufacturer is no longer a prerequisite to the application of the product line exception, the undisputed fact that Plaintiff's remedy against Omni is still available strongly counsels against invoking the exception. *See Conway*, 885 F.2d at 95; *cf. Van Doren v. Coe Press Equip. Corp.*, 592 F. Supp. 2d 776, 789 (E.D. Pa. 2008) (illustrating that where a defective machine was manufactured by a *now-dissolved* corporation, the successor to that corporation may be held liable under the product line exception because the injured party no longer has a remedy against the original manufacturer). One of the primary public policy goals of strict products liability is to require the manufacturers of defective products to act as insurers against the risk of injury their

---

[3]   The Pennsylvania Supreme Court strongly suggested that the determination of product-line successor status is reserved for the judge. *See Schmidt*, 11 A.3d at 946 n.24. The *Schmidt* Court noted that both the equitable nature of the exception and multi-factor balancing analysis "militate[d] in favor of allocating the decision to a judge." *Id.* This Court concurs and concludes that the product line exception inquiry is a question of law. *See Dawejko*, 434 A.2d at 111 ("[I]n any particular case *the court may consider whether it is just* to impose liability on the successor corporation.") (emphasis added).

products may cause. *See Dawejko*, 434 A.2d at 109. When there is no obstacle preventing an injured party from suing the actual manufacturer of a purportedly defective product–as is the case here–the justifications for invoking the product line exception to the general rule of successor non-liability are essentially non-existent. Indeed, this fact also indicates that the third *Ray* factor is not satisfied because fairness would not be promoted by requiring IR, as the successor to IROM, to assume liability for a defective product that was a burden attached to *Omni's* good will. *See id.* There is no evidence to suggest IR is currently enjoying Omni's good will "in the continued operation of [its] business" because IR simply has no successor relationship with Omni. Moreover, the fairness inquiry further counsels against the exception because IR's predecessor did not manufacture the allegedly defective product. The product line exception primarily seeks to hold the successor of a company which manufactured defective products liable for the harms the now-dissolved predecessor's products cause. *See id.* Fairness would not be promoted by holding IR strictly liable for the harms stemming from Omni's allegedly defective product when Omni is still a viable company.

Additionally, turning to the *Ramirez* test, the record evidence also demonstrates that IR's manufacturing operation is distinct from that of IROM.[4] IR is owned by a different group of investors than IROM (*see* IR SMF ¶ 60; PCMF to IR ¶ 60), services a different customer base (*see* IR SMF ¶ 65), uses different designs than IROM for the material handling equipment that it manufactures (Vandenack Dep. ¶ 20, Ex. 19, Doc. 64-1), and has

---

[4]   Plaintiff's Brief in Opposition fails to cite to record evidence for many of its assertions for why the product line exception applies. (*See, e.g.*, Doc. 76, at 10 (citing no record evidence for propositions (1), (2), (4), and (6)).) At the summary judgment stage, the nonmovant must cite to "affirmative evidence" supporting its version of the material facts, and the Court will not merit unsupported contentions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986); *Kamuck v. Shell Energy Holdings GP, LLC*, No. 4:11-CV-1425, 2015 WL 1345235, at *13 (M.D. Pa. Mar. 25, 2015) ("[A] party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist."). Plaintiff's Brief and accompanying Counterstatement of Facts frequently fail to support its assertions with citations to the record.

developed new products for sale (*see* IR SMF ¶ 64). Accordingly, after weighing the considerations explicated in *Ray* and *Ramirez*, and adopted with approval by the superior court in *Dawejko*, the Court concludes that it would not be "just to impose liability on the successor corporation" under the product line exception. *See Dawejko*, 434 A.2d at 111. IR cannot be held liable for Plaintiff's injuries stemming from IROM's sale of the CDLR-1. Because all of Plaintiff's claims implicating IR arise out of IROM's sale of the allegedly defective CDLR-1, IR's Motion for Summary Judgment will be granted.

**B. CHEP's Motion for Summary Judgment Will Be Granted with Respect to Plaintiff's Strict Products Liability Claims and Breach of Warranty Claim Because CHEP Did Not Manufacture, Distribute, or Sell the CDLR-1**

Plaintiff all but concedes that its claims for strict products liability and breach of warranty against CHEP cannot succeed. Plaintiff's Brief in Opposition to CHEP's Motion for Summary Judgment dedicates slightly more than one paragraph to the issue of strict products liability, which asserts in a conclusory fashion that Plaintiff has established a *prima facie* case and cites to no record evidence. (*See* Pl.'s Br. in Opp'n to CHEP 33.) Plaintiff never addresses CHEP's contention that the breach of warranty claim must also fail as a matter of law. Because CHEP did not manufacture, distribute, or sell the CDLR-1, it cannot be liable under either theory advanced by Plaintiff. Accordingly, CHEP's Motion for Summary Judgment will be granted on Counts IV and V.

"The duty in strict liability pertains to the duty of a manufacturer and of suppliers in the chain of distribution to the ultimate consumer." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 383 (Pa. 2014). Thus, in order to succeed on a strict products liability cause of action, "a plaintiff must prove that a *seller (manufacturer or distributor)* placed on the market a product in a 'defective condition.'" *Id.* at 384 (emphasis added); *see id.* at 383 ("[A] person or entity engaged in the business of selling a product has a duty to make and/or market the product free from a defective condition unreasonably dangerous to the consumer or [the consumer's] property.") (internal citation omitted); *cf. Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191-92 (Pa. Super. Ct. 1993) ("[A] defendant must be identified as the manufacturer, distributor, or

seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant. Absent such identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability.") (internal citation omitted).

Plaintiff has cited to no evidence demonstrating that CHEP manufactured, distributed, or sold the CDLR-1. In fact, Plaintiff has admitted that the CDLR-1 was manufactured by Omni, after which it was sold to IROM, then to Endless Warehouse in 1997, and then to Millwood in late 2007. (IR SMF ¶¶ 55, 67.) Because there is no evidence suggesting CHEP ever made or sold the machine in question, it had no duty to Plaintiff under Pennsylvania's strict products liability doctrine and therefore cannot be held liable under such a theory. *See Tincher*, 104 A.3d at 383. Additionally, because it is undisputed that CHEP did not sell the CDLR-1, it cannot be liable for a breach of the implied warranty of merchantability. *See* 13 Pa. Cons. Stat. § 2314(a).

### D. Plaintiff's Negligence Claims Against CHEP

Plaintiff's Amended Complaint alleges four theories of negligence against CHEP: (1) placing the CDLR-1 in the stream of commerce without taking steps to eliminate or minimize its dangers to users (Am. Compl. ¶ 61(A)); (2) failure to warn of the defective nature of the CDLR-1 (*id.* ¶ 61(B)); (3) failure to monitor the machine's use (*id.* ¶ 61(C)); and (4) failure to recall or remediate the product (*id.* ¶ 61(D)). CHEP contends that summary judgment should be granted because Plaintiff has failed to substantiate her claims with record evidence or they fail as a matter or law. (*See* CHEP Br. in Supp. 23-26, Doc. 67.) The Court agrees.

"A cause of action in negligence requires a showing of four elements: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage." *Pyeritz v. Pennsylvania*, 32 A.3d 687, 692 (Pa. 2011). "In a products liability case, the plaintiff must establish breach of duty and causation by showing that the injury was proximately caused by 'a specific defect in the manufacture or design of a product.'" *USAA Cas. Ins. Co. v. Metro. Edison Co.*, No. 1:12-CV-1178, 2014 WL 3943706, at *6 (M.D. Pa.

2014) (quoting *Brandon v. Ryder Truck Rental, Inc.*, 34 A.3d 104, 110 (Pa. Super. Ct. 2011)). Unlike a strict products liability claim, which "examines the product itself . . . without inquiring into the reasonableness of the manufacturer's conduct in creating and distributing such a product," a negligence action "revolves around an examination of the conduct of the defendant." *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003).

With respect to the first and second theories of negligence, there is no evidence that CHEP ever sold the CDLR-1 or otherwise placed the machine in the stream of commerce. Rather, the record when viewed most favorable to Plaintiff demonstrates that CHEP potentially owned the CDLR-1 when the injury occurred. (*See* Pl.'s Br. in Opp'n to CHEP 12-16.) However, in order for CHEP to have had a duty to eliminate or minimize any dangers present in the CDLR-1 before placing it in the stream of commerce, it must have been a manufacturer or seller of the machine. *See Mellon*, 636 A.2d at 191-92. Because CHEP is not identified as such, it cannot be held liable under a theory of negligence for placing a defective machine in the stream of commerce. Likewise, in order for CHEP to be held liable under a negligence theory for failing to provide adequate warnings or instructions, it must have been a seller or supplier. *See Hartford Mut. Ins. Co. v. Moorhead*, 578 A.2d 492, 498 (Pa. Super. Ct. 1990) (noting that "a *seller or supplier* of products may be deemed 'negligent' . . . for failing to provide adequate warnings or instructions which a reasonable *seller or supplier* would have") (emphasis added). Each theory of negligence therefore fails as a matter of law because CHEP owed no duty to Plaintiff.

Plaintiff's next theory of negligence is CHEP's failure to monitor the CDLR-1's use. Plaintiff does not directly address this claim in her Brief in Opposition, and cites to no cases recognizing a claim for failure to monitor a product's use. Construing the claim liberally as a one for failure to inspect, CHEP owed Plaintiff no duty in this regard because it was not the manufacturer or supplier of the CDLR-1. *See Facciponte v. Briggs & Stratton Corp.*, No. 3:09-CV-1584, 2011 WL 4916376, at \*2 (M.D. Pa. Oct. 17, 2011). Plaintiff has made no legal argument suggesting CHEP had a duty to monitor the CDLR-1's use. Accordingly, summary judgment will be granted in favor of CHEP on this claim.

Finally, Plaintiff's claim against CHEP for failure to recall and/or remediate the CDLR-1 fails as a matter of law. CHEP cannot recall a product that it did not manufacture or sell, and Pennsylvania law does not recognize a duty of a manufacturer/seller to retrofit its products. *See Lynch v. McStome & Lincoln Plaza Assocs.*, 548 A.2d 1276, 1280 (Pa. Super. Ct. 1988); *see also Habecker v. Copperloy Corp.*, 893 F.2d 49, 54 (3d Cir. 1990). Additionally, although it does not appear to be included in the Amended Complaint, Plaintiff's claim that CHEP negligently undertook the refit of the CDLR-1 is unsupported by the record. The only piece of evidence Plaintiff points to in support of its contention that CHEP is responsible for the decision to refit the CDLR-1 is the Deposition of David Shingler, Millwood's plant manager. (*See* Pl.'s Br. in Opp'n to CHEP 29.) The relevant testimony highlighted by Plaintiff states that the refit occurred prior to Plaintiff's injury, and Mr. Shingler opines that Millwood, *not CHEP*, was the entity that modified the machine. (Shingler Dep. 100:9-16.) Mr. Shingler subsequently testified that he did not know for certain whether CHEP was involved in the decisionmaking process to refit the CDLR-1. (Pl.'s Br. in Opp'n to CHEP 7.) Latching onto this statement of uncertainty, Plaintiff contends that there is a genuine issue of fact as to whether CHEP might have been involved in some capacity with the decision to refit the CDLR-1. The Court does not find such speculative evidence to present a genuine dispute as to whether CHEP played a role in the decision to refit the machine, especially considering the weight of the evidence demonstrating CHEP was not involved with the refit. (*See, e.g.*, Arnold Dep. 20:12-17, 20:23-21:5, 34:7-11, 51:8-18, Ex. D, Doc. 67-1.) Consequently, summary judgment will be granted to CHEP on Plaintiff's negligence claims arising out of the refit of the CDLR-1.[5]

---

[5] Plaintiff's Amended Complaint contained no claims alleging vicarious liability, and her attempt to insert such a claim under a theory of a joint venture in a responsive brief to CHEP's Motion for Summary Judgment is improper. *See Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *see also Romdhani v. Exxon Mobil Corp.*, No. 07-715-LPS, 2010 WL 4682414, at *4 (D. Del. Nov. 10, 2010) (new legal theories not raised in complaint cannot be raised in response to summary judgment motion).

All four theories of negligence advanced in Plaintiff's Amended Complaint are unsupported by record evidence or fail as a matter of law. Accordingly, CHEP's Motion for Summary Judgment on Count VI will be granted.

**E. Defendant Dykstra's Motion to Dismiss Will Be Granted**

Finally, the Court notes that Plaintiff concurs with Defendant Dykstra that he should be dismissed from this action. (*See* Pl.'s Br. in Opp'n to Dykstra 2, Doc. 61.) As such, Plaintiff's claims against Dykstra in Counts I, II, and III will be dismissed.

### III. Conclusion

For the above stated reasons, the Motions for Summary Judgment filed by Defendant IR and Defendant CHEP will be GRANTED. Plaintiff's claims against Defendant Dykstra will be DISMISSED.

An appropriate order follows.

December 5, 2016  /s/ A. Richard Caputo
Date  A. Richard Caputo
  United States District Judge